# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

Information associated with the Facebook user ID
100003865219073 that is stored at premises owned,
maintained, controlled, or operated by Facebook, a company
headquartered in Menlo Park, California.

)
)
)
)
)
)

Case No. 19-916M (NJ)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

■ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: 18 USC Section 2423(c)

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

HSI Special Agent Kevin C. Wrona
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: August 29, 2019

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

Hon. Nancy Joseph _____, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Kevin C. Wrona, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I am a Special Agent with the U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), and have been so employed since June 2010.  I am currently assigned to the HSI Office of the Resident Agent in Charge in Milwaukee, Wisconsin.  My duties include investigating criminal violations relating to child sexual exploitation and child pornography.  I have received training in the investigation of child pornography and child sexual exploitation offenses.

2.     I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored, owned, maintained, controlled, or operated by Facebook, a social network provider located at 1601 Willow Road, Menlo Park, California 94025. The information to be searched consists the account of Facebook user ID 100003865219073 (hereinafter, the SUBJECT ACCOUNT) that is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government copies of the information (including the content of communications) further described in Attachment B.

3.     The purpose of this application is to seize evidence more particularly described in Attachment B, of violations of 18 U.S.C. § 2423(c), which make it a crime to travel in foreign commerce or reside, either temporarily or permanently, in a foreign country, and engage in any illicit sexual conduct with another person who has not attained the age of eighteen. The statements contained in this Affidavit are based on my experience and background as a Special Agent with HSI, and by information provided by other law enforcement agents. Some information in this affidavit also comes from information received from the issuance of administrative summonses and search warrants. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence of violations of Title 18, United States Code, Section 2423 is located in the account described in Attachment A.

## DEFINITIONS

4.     The following definitions applies to this Affidavit and Attachment B to this Affidavit:

a.     "Chat" refers to any kind of communication over the Internet that offers a real-time transmission of text messages from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

2

b.      "Internet Service Providers" (ISPs), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet including telephone-based dial-up, broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite-based subscription.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber.  By using a computer equipped with a modem, the subscriber can establish communication with an ISP over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

c.      "ISP Records" are records maintained by ISPs pertaining to their subscribers (regardless of whether those subscribers are individuals or entities).  These records may include account application information, subscriber and billing information, account access information (often in the form of log files), e-mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format and in written or printed record format.  ISPs reserve and/or maintain computer disk storage space on their computer system for their subscribers' use.  This service by ISPs

3

allows for both temporary and long-term storage of electronic communications and many other types of electronic data and files.

      d.    "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet. IP addresses are also used by computer servers, including web servers, to communicate with other computers.

      e.    "Minor" means any person under the age of eighteen years. *See* 18 U.S.C. § 2256(1).

      f.    The terms "records," "documents," and "materials," include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators,

electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

       g.    "Illicit Sexual Conduct" means a sexual act with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States; any commercial sex act (as defined in 18 U.S.C. § 1591) with a person under 18 years of age; and production of child pornography (as defined in 18 U.S.C. § 2256(8)).

## BACKGROUND ON NATIONAL CENTER FOR MISSING AND EXPLOITED CHILDREN

      5.    Based on my training and experience, and publicly available information, I know that the National Center for Missing and Exploited Children (NCMEC) is a nonprofit organization in Alexandria, Virginia, that works with law enforcement on issues related to missing and sexually exploited children. One of the services provided and administered by NCMEC is its CyberTipline, which serves as the national clearinghouse for leads regarding sexual exploitation crimes against children.

      6.    In addition to reports from the general public, reports are made by U.S. electronic communication service (ECS) providers and remote computing services (RCS), which are required by 18 U.S.C. § 2258A to report "apparent child pornography" to NCMEC via the CyberTipline if they become aware of the content on their servers. Specially trained analysts, who examine and evaluate the reported content, review leads, add related information that may be useful to law enforcement, use publicly available search tools to determine the geographic location of the apparent criminal act,

and ultimately provide all of the gathered information to the appropriate law enforcement agency for review and possible investigation.

7. The CyberTipline receives reports, known as CyberTips, about the possession, production and distribution of child pornography; online enticement of children for sexual acts; child prostitution; sex tourism involving children; child sexual molestation; unsolicited obscene material sent to a child; misleading domain names; and misleading words or digital images on the Internet.

8. The CyberTip reports will vary in detail depending on the nature of the report, and which entity submits it. The reports can include information (1) relating to the identity of any individual who appears to have violated federal law by committing or attempting to commit the criminal conduct described above; (2) historical information on when or how a customer or subscriber of an ECS or RCS uploaded, transmitted, or received apparent child pornography; (3) geographical information on the involved individual or website, which may include the IP Address or verified billing address or geographic identifying information, including area code or zip code; (4) any images of apparent child pornography; and (5) the complete communication containing any image of apparent child pornography. *See* 18 U.S.C. § 2258A(b).

## **PROBABLE CAUSE**

9. On June 20, 2018, I was provided a CyberTip from NCMEC regarding Facebook usernames engaging in sexually explicit conduct. According to CyberTip (CT) 35013606, accounts with usernames Don Stevenson and Donald White were used to entice apparent minors who appeared to be located in the Philippines to engage in

6

sexual activity. The CT was reported to NCMEC directly from Facebook, and included Facebook usernames, Facebook user ID numbers, e-mail addresses and internet protocol (IP) addresses used to access the Facebook accounts. According to the CyberTip, these two accounts, along with an account with the username Don Stenson, were linked by machine cookie,[1] indicating the Facebook accounts were being logged into using the same electronic device.

10.     I initiated an investigation into the user of the Facebook accounts. During my investigation, I was able to link the accounts to Mr. Donald Stenson (DOB XX/XX/1956) who was a United States citizen. On May 8, 2019, federal search warrants were issued by the U.S. District Court for the Eastern District of Wisconsin on the following Facebook accounts: Don Stevenson (FB ID#: 100012891004557), Donald White (FB ID#: 100025143570455), Don Stenson (FB ID: 1529468944), and Don Chonmanee (FB ID: 100009337719641), all of which were linked to Mr. Stenson:

11.     On May 17, 2019, Facebook responded to the search warrants for the accounts of: Don Stevenson (FB ID#: 100012891004557), Donald White (FB ID#: 100025143570455), Don Stenson (FB ID: 1529468944), and Don Chonmanee (FB ID: 100009337719641). The search warrant returns showed the IP addresses used to log into the accounts, as well as message logs and transcripts between those accounts and other

---

[1] Facebook provided associated accounts via "cookie" technology. Cookies are a small text file created by a website that is stored in the user's computer either temporarily for that session only or permanently on the hard disk. Cookies provide a way for the website to recognize you and keep track of your preferences.

7

Facebook users on Facebook Messenger. Further, the search warrant returns contained the pictures and messages sent and received for each account.

12. Based on the information contained in the Facebook search warrant returns, it appeared that Mr. Stenson travelled to and from the Philippines and engaged in sexual activities with minors. I was able to review conversations on Facebook messenger between Mr. Stenson and what appeared to be minors discussing illicit sexual conduct. After reviewing the information and while working with law enforcement in the Philippines, multiple minors were identified in the Philippines who confirmed they communicated with Mr. Stenson via Facebook and engaged in illicit sexual conduct with Mr. Stenson at Hotel Le Carmen in Cebu, Philippines.

13. The minors explained that Mr. Stenson would pay them in Philippine pesos after the sex acts were completed, and would also give them gifts to include food, clothing, cellphones, computers, and payment for schooling. During the interviews, several of the minor females stated they knew of and/or have met Mr. Stenson's friend "John." When shown the Wisconsin driver's license picture for John Burgdorff (hereinafter, BURGDORFF), two of the minors identified him as Mr. Stenson's friend "John."

14. In reviewing the messages from the Facebook search warrant return for Mr. Stenson's accounts, I located a conversation between Mr. Stenson's Facebook account "Stevenson" and one of the minor victim's accounts, hereinafter referred to as Minor Victim M.K. (MVMK). A portion of that conversation is as follows:

-04/30/2017 – 05:03:49 UTC - MVMK: Your hotel still at La Carmen?

8

-04/30/2017 – 05:03:55 UTC – Stevenson: Yes..

-04/30/2017 – 05:04:11 UTC – MVMK: Okay

-04/30/2017 – 05:04:27 UTC – MVMK: what time you want i go there?

-04/30/2017 – 05:04:57 UTC – Stevenson: I want to exercise, but my friend hurt his ankle yesterday so he is stuck in his room and needs you to be his nurse.. ha ha ha.

-04/30/2017 – 05:05:01 UTC – Stevenson: make him feel better.

[…]

-04/30/2017 – 05:05:53 UTC – Stevenson: Why text? Just come now.. I don't want to text.

-04/30/2017 – 05:06:16 UTC – MVMK: Okay!

[…]

-04/30/2017 – 05:07:04 UTC – Stevenson: When you arrive go to room 304

-04/30/2017 – 05:07:08 UTC – Stevenson: across from my room

-04/30/2017 – 05:07:26 UTC – [Stevenson sends a picture of an older white male, with grey hair and grey mustache, with no shirt on, in what appears to be blue shorts, standing in front of a neon sign that reads "Cebu Westown lagoon"]

-04/30/2017 – 05:05:34 UTC – Stevenson: That is my friend.

[…]

-04/30/2017 – 05:11:27 UTC – MVMK: i log out now!

-04/30/2017 – 05:12:04 UTC – Stevenson: Okay.. Just come to room 304… I will be at the sports center, but my friend is waiting to talk with you.. and share with you.

-05/03/2017 – 06:07:16 UTC – Stevenson: What are you doing at 5 pm. John is lonely.

-05/03/2017 – 06:07:29 UTC – MVMK: nothing!

-05/03/2017 – 06:08:08 UTC – Stevenson: What about 4 pm?

-05/03/2017 – 06:09:01 UTC – MVMK: nothing! i'm just lying in my bed so very bored

-05/03/2017 – 06:10:23 UTC – Stevenson: Ok… be here at 4 for bonding with John and i will give you a hug.

15.     I know from my training and experience and in reviewing the messages in this case, that when the Stevenson account states, "share with you" and "bonding," those words likely refer to some type of sexual interaction.

9

16.     A second Facebook conversation I reviewed was between Mr. Stenson's "Don Stevenson" account and "Jon Bedford," the SUBJECT ACCOUNT. When reviewing the profile photo for the Jon Bedord Facebook account, the person photographed appeared to be the same person as that of BURGDORFF.

17.     The following is an example of some of the Facebook Messenger chats between Don Stevenson and Bedford:

-09/03/2017 – 04:11:20 UTC – Stevenson: Somehow she scrounged up enough money for the ticket. As long as you and I are in touch, we might be able to help her minimally.
-09/03/2017 – 04:11:31 UTC – Stevenson: Until you get your just desserts
-09/03/2017 – 04:11:53 UTC – Stevenson: Because I am of the firm belief that psychos give the best sex.
-09/03/2017 – 04:12:28 UTC – Bedford: Well, right now, my thoughts are that either you "move" on her and help her, or I help her and I keep sending her more money, without any expectations of every getting any return on investment [...]
-09/03/2017 – 04:19:52 UTC – Stevenson: Ohh I have no emotions stake in it at all.
-09/03/2017 – 04:19:27 UTC – Bedford: Ahhhh you are scamming her then
-09/03/2017 – 04:19:32 UTC – Stevenson: It is a matter of being in the same place at the same time as her to "collect"
-09/03/2017 – 04:19:52 UTC – Bedford: I was 3 months ago
-09/03/2017 – 04:19:58 UTC – Stevenson: I wouldn't call it scamming. I am calling it, bonding.
-09/03/2017 – 04:20:10 UTC – Bedford: Screwing

-09/04/2017 – 14:40:22 UTC – Bedford: I think the mentoring is as important to hrlp her as money is. Or more important
-09/04/2017 – 14:41:09 UTC – Stevenson: Especially a teenager tempted to join peers to party and socialize all the time when takin initiative to gain skills which aren't apparent isn't her strong suit.
-09/04/2017 – 14:42:05 UTC – Bedford: Well, we have her analized
-09/04/2017 – 14:42:26 UTC – Stevenson: ha ha.. I like that spelling
-09/04/2017 – 14:42:27 UTC – Bedford: No anal. Ize her us next
-09/04/2017 – 14:42:49 UTC – Bedford: Is next
-09/04/2017 – 14:43:34 UTC – Bedford: Actually, i never did it and can't keep it up to do it

-09/05/2017 – 10:51:55 UTC – [Stevenson sends Bedford a picture that appears to be of Mr. Stenson lying in bed with two of Mr. Stenson's identified minor victims from the Philippines]
-09/05/2017 – 10:52:12 UTC – Bedford: Wow
-09/05/2017 – 10:52:29 UTC – Stevenson: Gotta get a last minute massage..
-09/05/2017 – 10:53:09 UTC – Bedford: Ok. Say hi to smiling girls
-09/05/2017 – 10:53:17 UTC – Stevenson: [Gives the names of two of the identified minor victims]
[...]
-09/05/2017 – 10:54:49 UTC – Stevenson: yes.. should I give her something for you?
-09/05/2017 – 10:55:09 UTC – Bedford: Me pe…. A kiss

-09/28/2017 – 11:16:43 UTC – Bedford: Got this from someone using [Identified minor victim's] account
[Bedford sends a picture of a young Filipino child, wearing a Golden State Warriors tank top, playing with a plastic snake]
-09/28/2017 – 11:17:37 UTC – Stevenson: They just sent it to me too.
-09/28/2017 – 11:17:53 UTC – Stevenson: I don't know if it is [Identified female victim] or D. [Mother of two of the identified female victims].

18.     I have reviewed the Wisconsin Department of Motor Vehicles records, as well as open source database checks, which indicated that Mr. Stenson had 2939 S. 101st St., West Allis, WI 53227 listed as his current residence. The City of West Allis Assessor's Office website indicated that the property was owned by a "John H. Burgdorff" and the Wisconsin Department of Motor Vehicles database indicated that BURGDORFF has the same address of 2939 S. 101st St., West Allis, WI 53227 listed as his current address of record. Further, the picture on BURGDORFF's Wisconsin driver's license appears to be the same as the person in the picture that the Stevenson Facebook

11

account sent to MVMK on 04/30/2017 and the same as the Facebook profile picture on the Bedford account.

19.     Further, on July 12, 2019, Mr. Stenson was arrested at the 2939 S. 101st St., West Allis, WI 53227 address for engaging in illicit sexual conduct in a foreign place. On the date of the arrest, BURGDORFF was at the residence and the individual I saw who identified himself as BURGDORFF appeared to be the same person as that in the photo that was sent to MVMK on 04/30/2017 and in the Bedford Facebook profile photo.

## FACEBOOK

20.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

21.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

22.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook

12

assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

23.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

24.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby

13

revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

25.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

26.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

27.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

28.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

29.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

30.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

31.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

32.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

15

33.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace

34.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

35.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

36.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that

16

the user viewed the profile, and would show when and from what IP address the user did so.

37.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

38.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may

17

be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

     39.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

18

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

40.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications).

41.    Based on the forgoing, I request that the Court issue the proposed search warrant.

42.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

43.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

44.    I request that the Court order Facebook not to notify any person (including the subscribers or customers of the account listed in Attachment A) of the existence of the requested warrant before September 1, 2020, or until further order of the Court.  Facebook is a provider of an electronic communication service, as defined in 18 U.S.C. § 2510(15), and/or a remote computer service, as defined in 18 U.S.C. § 2711(2).  Pursuant to 18 U.S.C. § 2703, I seek a warrant requiring Facebook to disclose records and information in connection with a criminal investigation.  This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant …

is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant … ."  Id.

45.     Here, such an order is appropriate because the requested warrant relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the ongoing investigation.  Accordingly, there is reason to believe that notification of the existence of the requested warrant will seriously jeopardize the investigation, by giving the target an opportunity to destroy or tamper with evidence, or otherwise seriously jeopardize an investigation.  *See* 18 U.S.C. § 2705(b).  John BURGDORFF is not aware of the investigation into him. If he were to learn the government is investigating him, he could destroy additional evidence of his crimes that may exist and be revealed during the search of his Facebook accounts.

46.     Based on the forgoing, I request that the Court issue the proposed search warrant.  Because the warrant will be served on Facebook who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

## <u>ATTACHMENT A</u>

### Property to Be Searched

This warrant applies to information associated with the Facebook user ID 100003865219073 that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted, but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(d), Facebook is required to disclose the following information to the government for the ID listed in Attachment A:

(a) All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c) All photos uploaded by that user ID and all photos uploaded by any user that has that user tagged in them;

(d) All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend"

requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests; including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers);

(f)     Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(g)     Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(h)     All "check ins" and other location information;

(i)     All IP logs, including all records of the IP addresses that logged into the account;

(j)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non- Facebook webpages and content that the user has "liked";

(k)     All information about the Facebook pages that the account is or was a "fan" of;

(l)     All past and present lists of friends created by the account;

(m)     All records of Facebook searches performed by the account;

(n)     All information about the user's access and use of Facebook Marketplace; and

(o)     Records of any Facebook accounts that are linked to the Account by machine cookies (meaning all Facebook user IDs that logged into Facebook by the same machine as the Account). The types of service utilized by the user;

(p)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(q)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(r)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

(s)     Records relating to who created, used, or communicated with the user ID, including records about their identities and whereabouts.